Michael Schuster (Admitted *Pro Hac Vice*)
P. Kyle Cheves (SBN 24126723)
Polsinelli PC
4020 Maple Ave Suite 300
Dallas, TX 75219
Telephone: (214) 397-0030
mschuster@polsinelli.com
kcheves@polsinelli.com

COUNSEL TO LENDERS

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Falls of Braeburn, LLC, *et al.*, | Case No. 25-90602 (CML) |
| Debtors. | (Jointly Administered) |

**SECURED LENDERS' MOTION TO APPOINT CHAPTER 11 TRUSTEE**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

COMES NOW (i) Computershare Trust Company, National Association, as Trustee for the benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2024-5C1, Commercial Mortgage Pass-Through Certificates, Series 2024-5C1, by and through Argentic Services Company LP, as Special Servicer, and (ii) Computershare Trust Company, National Association, as Trustee for the benefit of the Registered Holders of Wells Fargo Commercial

1

109221261.1

Mortgage Trust 2025-5C3, Commercial Mortgage Pass-Through Certificates, Series 2025-5C3, by and through Argentic Services Company LP, as Special Servicer (collectively, the "**Lenders**"), by and through undersigned counsel, respectfully requests entry of an order appointing a chapter 11 trustee pursuant to 1104(a) ("**Motion**")[1]. In support of the Motion, Lenders respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

During the first 100 days of these bankruptcy cases, Debtors: (i) obtained cash collateral orders based on materially false and misleading financial statements; (ii) caused a two-month long insurance coverage lapse; (iii) failed to make Court-ordered adequate protection payments; (iv) allowed the unnecessary accrual of administrative expenses by failing to pay approved budget items; (iv) misrepresented their unit occupancy and rent rolls; (v) failed to maintain basic lease records; (vi) took funds from non-debtor affiliates to pay for estate expenses without court approval; (viii) failed to reserve funds for United States Trustee's fees; (ix) appointed an attorney with minimal experience operating rental properties as its sole authorized representative and manager in bankruptcy; and (vii) generally, failed to maintain its rental properties in a safe and appropriate manner for its approximately 1,000 residents.

The only positive action taken by the Debtors in these cases was their entry into a Court approved Property Management Agreement with Lynd Management Group, LLC ("**Lynd Management**"). *See* ECF Nos. 73 and 86. Lenders supported Debtors selection of Lynd Management as a property manager, but critically, Lynd Management was not appointed to serve in any fiduciary capacity. Nevertheless, Debtors have effectively delegated all of their fiduciary

---

[1] Unless otherwise indicated herein, all references to the "Bankruptcy Code" or "Code" shall refer to 11 U.S.C. § 101, *et seq*.  References to a "Section" or "§" shall refer to the indicated section of the Bankruptcy Code.

duties as debtors-in-possession to Lynd Management, who are not accountable to the same fiduciary standards.

Meanwhile, Debtor's cash position and projected future operations, even as corrected by Lynd Management's diligence, will not generate sufficient net income to overcome the gross mismanagement and substantial losses suffered under the control of Debtor's managing member, Rao Polavarapu ("**Mr. Polavarapu**"). Continued operation of this estate in Chapter 11 without an effective fiduciary would only deepen the Debtor's insolvency while worsening its prospects for an orderly liquidation or reorganization. The only path forward to prevent further mismanagement and to ensure that the case is conducted fairly to all parties is the appointment of a Chapter 11 trustee.

## **FACTS SUPPORTING REQUESTED RELIEF**

### I.     **The Bankruptcy Case**

1.     On November 3, 2025 (the "**Petition Date**"), Debtor commenced the Chapter 11 Case under Title 11, United States Code (the "**Bankruptcy Code**"). Since the Petition Date, the Debtor has been operating as a debtor-in-possession.

2.     As of the date hereof, no Committee has been appointed in the Chapter 11 Case.

3.     The Meeting of Creditors was held and concluded on January 13, 2026.

4.     Mr. Polavarapu is the president, managing member, and ultimate owner of 100% of the equity interests in the Debtors.

### II.     **Houston Loan Portfolio and Default[2]**

5.     On or about June 14, 2024, Wells Fargo Bank, National Association, a national banking organization organized under federal law ("**Houston Portfolio Original Lender**"), made

---

[2] As used herein, the term "Houston Portfolio" refers collectively to the properties owned by Debtors Falls of Braeburn, LLC, Falls of Chelsea Lane, LLC, and Northwest Miami Gardens, LP.

109221261.1

a $64,500,000.00 loan to Falls of Braeburn, LLC, Falls of Chelsea Lane, LLC, and Northwest Miami Gardens, LP (respectively, the "**Houston Portfolio Loan**" and the "**Houston Portfolio Debtors**").

6.      In connection with the Houston Portfolio Loan and to evidence the debt owed thereunder, the Houston Portfolio Debtors each executed the following: (i) a Promissory Note dated June 14, 2024, in the original principal amount of $64,500,000.00 (the "**Houston Portfolio Note**") and (ii) a Loan Agreement dated June 14, 2024 (the "**Houston Portfolio Loan Agreement**").[3]

7.      In order to secure the amounts owed under the Note, in part, the Houston Portfolio Debtors each executed a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 14, 2024 (the "**Houston Portfolio Mortgage**"), which Mortgage encumbers the Houston Portfolio, as identified in the Houston Portfolio Mortgage.

8.      The Houston Portfolio Debtors failed to timely and fully make the required payments of debt service beginning with the payment due in July 2025 (the "**Houston Portfolio Payment Default**") and, as a result, the Houston Portfolio Debtors are in default and one or more Events of Default occurred under the Houston Portfolio Loan.

9.      By letter dated July 11, 2025 (the "**Houston Portfolio Notice of Default and Acceleration**"), Lender notified the Houston Portfolio Debtors of their default under the Houston Portfolio Loan, as well as Lender's election to accelerate the indebtedness owed under the Houston Portfolio Note and other loan documents.  In the Houston Portfolio Notice of Default and Acceleration, Lender also notified the Houston Portfolio Debtors that as a result of the acceleration, the Houston Debtors' authority under the Loan Documents to receive, collect and

---

[3] The loan documents referenced herein are voluminous and therefore not attached hereto. Those documents are available to interested parties upon request to undersigned counsel.

make use of rents, profits and income of any type (the "**Rents**") was revoked, and all such Rents became the Property of Lender.

10.     Despite demand, the Houston Portfolio Debtors failed to pay the accelerated balance due under the Houston Portfolio Loan, which remains in default.  The Houston Portfolio Debtors also failed to deliver the Rents to which Lender is entitled or apply the Rents to the payment of principal and interest due under the Houston Portfolio Note and to the payment of actual and reasonable operating expenses of the Houston Portfolio as they become due and payable, thereby triggering additional recourse obligations.

11.     Following Lender's acceleration of the debt owed under the Houston Portfolio Note and in connection with the Houston Portfolio Loan, Lender elected to schedule the Houston Portfolio properties to be sold at a non-judicial foreclosure sale, as permitted by Texas law (referred to herein as the "**Houston Portfolio Sale**").  The Houston Portfolio Sale was originally scheduled for August 5, 2025, but was later adjourned and scheduled for November 4, 2025. On November 3, 2025, one day prior to the Houston Portfolio Sale, however, the Houston Portfolio Debtors each commenced these bankruptcy cases.

       **III.**    <u>**Westpark Loan and Default.**</u>

12.     On or about December 2, 2024, Argentic Real Estate Finance 2 LLC, a Delaware limited liability company ("**Westpark Original Lender**"), made a $29,000,000.00 loan to Falls of Westpark Apartments, Ltd. (the "**Westpark Debtor**" and the "**Westpark Loan**").

13.     In connection with the Westpark Loan and to evidence the debt owed thereunder, Westpark Debtor executed the following: (i) a certain Promissory Note dated December 2, 2024, in the original principal amount of $29,000,000.00 (the "**Westpark Note**") and (ii) a certain Loan Agreement dated December 2, 2024, executed by Borrower (the "**Westpark Loan Agreement**").

14.    In order to secure the amounts owed under the Westpark Note, in part, Westpark Debtor executed a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated December 2, 2024 (the "**Westpark Mortgage**"), which Westpark Mortgage encumbers certain real property, as identified on Schedule A to the Westpark Mortgage (as such real property and improvements are described in the Mortgage, the "**Westpark Property**").

15.    Westpark Debtor failed to timely and fully make its required payments of Debt Service beginning with the payment due in July 2025 and, as a result, Westpark Debtor is in default and one or more Events of Default have occurred under the Westpark Loan Documents. Additionally, Westpark Debtor failed to maintain its required insurance coverage as required under Section 7 of the Westpark Loan Agreement, which is another default under the Westpark Loan Documents (the "**Westpark Defaults**").

16.    By letter dated August 1, 2025 (the "**Westpark Notice of Default and Acceleration**"), Lender notified Westpark Debtor of its default under the Westpark Loan Documents due to the Westpark Defaults, as well as Lender's election to accelerate the indebtedness owed under the Westpark Note and other Westpark Loan Documents.  In the Westpark Notice of Default and Acceleration, Lender also notified Westpark Debtor that as a result of the acceleration, Westpark Debtor's license under the Loan Documents to receive, collect and make use of rents, profits and income of any type (the "**Westpark Rents**") is revoked.

17.    Despite demand, Westpark Debtor failed to pay the accelerated balance due under the Westpark Loan Documents and remains in default.  Westpark Debtor also failed to deliver the Westpark Rents to which Lender is entitled or apply the Westpark Rents to the payment of Principal and interest due under the Westpark Note and to the payment of actual and reasonable operating expenses of the Westpark Property as they become due and payable.

109221261.1

18.     Following Lender's acceleration of the debt owed under the Westpark Note and in connection with the Westpark Loan, Lender elected to schedule the Westpark Property to be sold at a non-judicial foreclosure sale, as permitted by Texas law, on November 4, 2025 ("**Westpark Sale**").  On November 3, 2025, one day prior to the Westpark Sale, Westpark Debtor commenced its bankruptcy case.

### IV.     Facts Establishing Dishonesty, Incompetence, and Mismanagement

#### A.     Debtors Obtained Cash Collateral Orders Based on Materially False and Misleading Financial Statements.

19.     On November 7, 2025, the Court entered its *Interim Order Authorizing the Debtors to (I) Utilize Cash Collateral, (II) Granting Adequate Protections, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [ECF No. 25].

20.     On November 21, 2025, the Court entered its *Second Interim Order Authorizing the Debtors to (I) Utilize Cash Collateral, (II) Granting Adequate Protections, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [ECF No. 40].

21.     On January 13, 2026, the Court entered its *Third Interim Order Authorizing the Debtors to (I) Utilize Cash Collateral, (II) Granting Adequate Protections, (III) Modifying the Automatic Stay, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [ECF No. 85].[4]

22.     In connection with each of the Cash Collateral Orders, the Debtors submitted interim budgets which they represented under penalty of perjury to be a complete and accurate description of its revenues, expenses, and operational cash needs. *See* ECF Nos. 16, 17, 42, and 76. *See also Declaration of Siri Khalsa*, ECF No. 10 at ¶¶ 44-48.

---

[4] The First, Second, and Third Interim Cash Collateral Orders are collectively referenced as the "**Cash Collateral Orders**").

23.     Based on those representations, Debtors proposed adequate protection to Lenders in the form of cash payments of agreed upon amounts based on the specified reserves in the Houston Portfolio Loan Documents and the Westpark Loan Documents.   Initially, adequate protection payments were made, although one such payment came not from the Debtors but from a non-debtor affiliate called Falls Group Management, LLC. *See* Wire Confirmation attached hereto as **Exhibit 1**.

24.     On February 9, 2026, when the time came for the Debtors to provide their updated variance reports and proposed final or fourth interim cash collateral budget, Lenders received information from Lynd Management that, based on their independent diligence regarding the Debtors' financial affairs and books and records, "these Debtors cannot afford the court ordered adequate protection payments." It quickly became clear that this was not a simple projection error. Rather, Lynd Management gave an extraordinary revelation: "The budgets attached to the interim order are not reflective of reality."

25.     Further investigation will reveal additional details of the Debtors' methods, but it is presently clear that Debtors' budgets, and related reporting to Lenders, misrepresented Debtors' occupancy and/or rental rates to artificially inflate their income projections by forecasting rental income from vacant units.[5]   Debtors' reporting indicates the Houston Portfolio Debtors inflated their rent roll revenue by at least 25%, and the Westpark Debtor inflated its rent roll revenue by at least 15%. *See* Variance Report attached hereto as **Exhibit 2**. Considering that the Cash Collateral Orders impose a maximum 10% budget variance, the Debtors misled Lenders and the Court into

---

[5] The Debtors' misleading financial statements may have been at least in part caused by its failure to maintain leasing records for all of its units. In many cases, Lenders understand there were no current leases in effect for occupied units, and many lease records have been stored in archaic and disorganized paper records.

109221261.1

approving budgets while knowingly operating at levels below the cash collateral variance threshold.

26.    To be clear, these are not Debtors who merely failed to meet reasonable financial projections. These are Debtors who obtained Cash Collateral Orders upon dishonest and fictional budgets. The Debtors were in violation of each Cash Collateral Order the moment those Orders were entered.[6]

**B.    Debtors Caused a Two-Month Insurance Coverage Lapse.**

27.    Unbeknownst to Lenders, on December 8, 2025, Debtors received a notice from Texas Insurance Company indicating that Policy No. 29803 would be cancelled for non-payment of a $502,727.60 account balance. *See* Cancellation Notice attached hereto as **Exhibit 3**. 3Apparently, Debtors ignored this notice for almost two months, taking no action to preserve their insurance coverage until being notified *by Lynd Management* on January 30, 2026 that their coverage was cancelled. Lynd Management, not Debtors, discovered the insurance lapse.[7]

28.    Debtors' response to the cancellation of its insurance was to cause a non-debtor affiliate, Falls of Braeswood, to transfer $206,481.88 from its account in apparent payment of insurance premiums (leaving only $2,404.34 in the Braeswood account). *See* Payment Confirmation attached hereto as **Exhibit 4**. Debtors have not responded to Lenders' request for information regarding whether the funds advanced by this non-debtor entity were made as a loan to the Debtors, a capital contribution by ownership, a repayment of a prepetition debt, or something

---

[6] Additionally, the Debtors recently confirmed they never budgeted to pay statutory U.S. Trustee fees and likely will not have sufficient cash to do so.

[7] Additionally, Lynd Management's discovery of the insurance lapse evidences that Debtors failed to comply with applicable debtor-in-possession requirements because the U.S. Trustee did not receive direct notice of cancelation because it was not named as a loss payee on the insurance policy.

else. It is also not clear whether non-debtor funds advanced for the benefit of these Debtors would be subject to a lien held by some other secured party.

29.     Lenders are informed by Lynd Management that insurance has now been reinstated. That would not be the case but for the diligence of Lynd Management. The Debtors, left to their own devices, allowed the coverage lapse to continue for two months. Plainly, the Debtors lack management competence to perform even the most basic responsibilities of property ownership.

**C.      Debtors Permitted the Unnecessary Accrual of Administrative Expenses**

30.     Debtors' variance report indicates income between 12% and 26% below projections and expenditures between 8% and 20% below projections. *See* Exhibit 2.  The significant reduction in expenditures reflects that the Debtor could not pay approved budget line-items from budgeted, yet phantom, income. But while the Debtors' budgeted income was not real, their expenses and funding obligations are very real.

31.     The result is two-fold. First, Debtors are putting the properties and their residents at significant risk of a cessation of services, such as cancellation of utilities or trash pickup. Second, service providers are continuing to perform post-petition without payment. These will be administrative expense claims which must be administered by an independent fiduciary to ensure fairness and equality amongst all interested parties. Debtors continued possession of the estates serves only to increase the likelihood of administrative insolvency.

**D.      Debtors Continue Treating Non-Debtor Cash As Their Own.**

32.     During the pre-petition period, Debtors maintained a haphazard, informal, and completely undisciplined cash management program. Debtors' practice was to move money between Debtors' insiders and affiliates on an ad hoc basis whenever needed, resulting in between

109221261.1

61% and 82% of all Debtors' *gross* revenues for 2025 being subject to insider transfers. *See* Transfers Summary attached hereto as **Exhibit 5**.

33.     Notably, Mr. Khalsa's Declaration stated that "the Debtors' existing Accounts and Cash Management System function smoothly and permit the efficient collections and disbursements of cash[.]" *See Declaration of Siri Khalsa*, ECF No. 10 at ¶¶ 28. This sworn statement cannot in any way be reconciled with the facts subsequently discovered by Lynd Management.

34.     Moreover, and as noted above, there is evidence Mr. Polavarapu continued making insider cash transfers post-petition. At minimum, Mr. Polavarapu moved $206,481.88 from an entity called Falls of Braeswood to pay for these Debtors' insurance coverage. *See* Exhibit 4. Mr. Polavarapu also caused an adequate protection payment to be made from funds belonging to Falls Group Management, Inc. *See* Exhibit 1.

35.     Meanwhile, the Debtors have only filed monthly operating reports for the first month of these cases. Lenders have no visibility into the Debtors' transfers beyond the single monthly operating report and the information filtered by Lynd Management. A Chapter 11 Trustee is necessary to investigate the Debtors' massive insider transfers, both pre-petition and post-petition, and bring avoidance or other claims if appropriate.

        **E.      Debtors Delegate Fiduciary Duties to Lynd Management.**

36.     Upon commencement of these bankruptcy cases, Debtors appointed Siri Khalsa as their sole authorized representative. Mr. Khalsa is an attorney with little to no experience managing rental apartments, let alone conducting operations at the scope and scale of the Debtors' business. Mr. Khalsa was not engaged in operating Debtors' businesses pre-petition.

37.     Mr. Polavarapu, not Mr. Khalsa, has always been the Debtors' control person throughout these Chapter 11 cases. Mr. Polavarapu did not appear at the Section 341 Meeting of Creditors and has not appeared at Court hearings. Debtors did not designate Mr. Polavarapu as a person with knowledge of any of the matters designated on Lenders Notice of Rule 2004 Exam, despite identifying numerous subordinates as knowledgeable. Mr. Polavarapu has operated fully behind the scenes, and Mr. Khalsa's appointment served only to obfuscate Mr. Polavarapu's inability to competently perform the Debtors' duties as debtors-in-possession.

38.     In any event, since the effective date of Lynd Management's employment, all of the Debtors' operational, management, and financial reporting tasks have been performed by Lynd Management or at Lynd Management's explicit direction. Lenders understand that Lynd Management needed to reconstruct Debtors' financial records and systems practically from scratch to make sense of them.

39.     More specifically, Lynd Management: (i) prepared the Debtors' fourth interim cash collateral budget, (ii) created the Debtors' rent rolls; (iii) prepared information for the Debtors' brokers to use in marketing; (iv) identified and cured the Debtors' insurance lapse; (v) interviewed the Debtors' employees and vetted their background and work authorization; and (vi) created and implemented the Debtors' previously non-existent lease marketing program. These are all the Debtors' fiduciary duties to perform, not Lynd Management's. But for Lynd Management, no one would be performing these tasks at all.

## ARGUMENT AND SUPPORTING AUTHORITIES

### I.     Jurisdiction and Venue

40.     This Motion arises under Title 11. *See In re Ford Steel, LLC*, 629 B.R. 871, 877 (Bankr. S.D. Tex. 2021).

41.     The Court has core jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 1334(a).

42.     Venue is proper before this Court pursuant to 28 U.S.C. § 1408(1).

**II.      Grounds for Appointing a Chapter 11 Trustee**

43.     Pursuant to Bankruptcy Code § 1104, a Chapter 11 trustee may be appointed for "cause" or if it is in the best interests of the estate and its creditors:

> **(a)** At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-
>> **(1)** for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>> **(2)** if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

44.     "The parties moving to appoint a trustee bear the burden, by clear and convincing evidence, of demonstrating that cause exists for the appointment of a trustee." *In re Amerejuve, Inc.*, No. 14-35482, 2015 WL 2226344, at *6 (Bankr. S.D. Tex. Apr. 29, 2015). "The court considers the totality of the circumstances in determining whether to appoint a trustee*." In re New Millenium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *5 (Bankr. S.D. Tex. Feb. 25, 2014), *citing In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989).

45.     Additionally, in making their decision, Courts give "weight to the lack of confidence of the United States Trustee and the creditors expressed in current management of the

Debtors." *In re Esco Elevators, Inc.*, No. 494-44339-MT-11, 1995 WL 605982, at *4 (Bankr. N.D. Tex. Jan. 31, 1995).

    **A.     Grounds for Appointment under Section 1104(a)(1).**

    46.    Pursuant to Section 1104(a)(1), Texas Bankruptcy Courts regularly appoint a Chapter 11 Trustee where the debtor has engaged in fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor. For this purpose, "cause" can be found from events or activities either before *or* after the commencement of the case. 11 U.S.C. § 1104(a). *See In re Patman Drilling Int'l, Inc.*, No. 07-34622-SGJ, 2008 WL 724086, at *5 (Bankr. N.D. Tex. Mar. 14, 2008) ("combination of dishonesty, incompetence, or gross mismanagement of the affairs of the Debtor" was found to warrant appointment of trustee where principal failed to negotiate with debtor's lenders during case, and debtor lost and continued to lose money at a phenomenal rate"); *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985) (Chapter 11 debtor's refusal to file federal income tax returns, subjecting estate to possible interest and penalties on taxes due and owing, coupled with debtor's refusal to collect outstanding debts owed to estate or to investigate potential preferential transfers, was conclusive evidence of gross mismanagement to detriment of estate, warranting appointment of trustee.); *In re Amerejuve, Inc.*, 2015 WL 2226344 (pre-petition embezzlement of debtor's funds established fraud warranting appointment of trustee).

    47.    Moreover, "[t]he grounds for appointing a trustee in Chapter 11 are not limited to the derelictions specifically listed in § 1104(a)(1)." *In re Esco Elevators, Inc.*, 1995 WL 605982, at *3. For example, in *In re Patman Drilling Int'l, Inc.*, the court found cause for appointment of a Chapter 11 Trustee where there were numerous conflict of interest and excessive compensation issues. *In re Patman Drilling Int'l, Inc.*, 2008 WL 724086, at *4. The conflicts of interest warranting appointment of trustee included large transactions between the debtor and insiders

warranting investigation and possible litigation, insider relationship with characteristics of self-dealing, undocumented insider loans, leases with insiders, and unauthorized distributions. *Id.*

48.     Further, each Debtor has a fiduciary duty of care to protect its assets, a duty of loyalty, and a duty of impartiality. To fulfill its duties, a debtor-in-possession must avoid self-dealing, conflicts of interest, and the appearance of impropriety." As part of these duties, "the debtor-in-possession must account for all of the estate's property." *In re Herberman*, 122 B.R. 273, 281 (Bankr. W.D. Tex. 1990).

49.     Courts are not limited to appointing a trustee solely upon finding "cause" to do so. That is, "[i]t is not necessary to find fault on the part of the debtor-in-possession before appointing a chapter 11 trustee." *In re Ford Steel, LLC*, 629 B.R. at 889–90. "Section 1104(a)(2) allows the Court to look to what is in the best interest of the creditors, equity security holders and others with an interest in the estate." *In re Evans*, 48 B.R.at 48.

50.     Finally, the Bankruptcy Code is clear that the only person who can exercise a chapter 11 debtor-in-possession's fiduciary duties is either the debtor-in-possession itself or a duly appointed Chapter 11 trustee. *See In re Casco Bay Lines, Inc.*, 17 B.R. 946, 951 – 952 (B.A.P. 1st Cir. 1982) (When a trustee is appointed, . . . control [over the debtor's affairs] is transferred to the trustee who assumes the decision-making function previously held by the debtor's management . . .").

51.     Obviously, Lynd Management has not been appointed to serve as a Chapter 11 trustee. Lynd Management cannot exercise control over the Debtors' affairs, but simultaneously, it is plain and certain these Debtors cannot competently exercise control without being told what to do by Lynd Management. Together with all of the evidence of dishonesty, incompetence, and gross mismanagement, it is clear these Debtors have become runaway trains with no conductor.

Under these facts, the Court must find "cause" to appoint a Trustee and put the Debtors back on track.

**B.      Grounds for Appointment under Section 1104(a)(2).**

52.      "When deciding whether relief under § 1104(a)(2) is warranted, courts consider: (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee; balanced against the cost of the appointment." *In re Ford Steel, LLC*, 629 B.R. at 889–90; *see also In re Evans*, 48 B.R. at 48 ("The factors to be considered when using this section are: (1) The trustworthiness of the debtor; (2) The reasons the debtor acted as he did; (3) Reliance and harm to another party; (4) Conclusive evidence of detriment to the estate; (5) Possibilities of future rehabilitation.").

53.      "Notwithstanding the articulation of these factors, the § 1104(a)(2) standard is flexible. Ultimately, the court should consider the practical realities, necessities of the case, and the totality of the circumstances in determining whether to appoint a trustee." *In re Ford Steel, LLC*, 629 B.R. at 889–90. For example, *In re Esco Elevators, Inc.* the court appointed a Chapter 11 Trustee under the "best interests" test because and "experienced trustee [would] be able to bring order to the chaos of the affairs of these Debtors and to take such actions as will maximize the value of the estate assets and will enhance the prospects of recovery by all creditors." *In re Esco Elevators, Inc.*, 1995 WL 605982, at *5. The *Esco Elevators* court further found that a Chapter 11 Trustee would be "able to investigate and report the causes of bankruptcy, pre- and post-petition transactions and transfers, and the other questions of the creditors regarding the demise of what was a substantial and operating business." *Id.*

54.     Similarly, in *In re Evans*, the appointment of a Chapter 11 Trustee was in the best interest of the estate where "[t]he trustworthiness of the Debtor to protect the interests of the estate [was] in doubt" due to the debtor's failure to perform his duty of filing federal income tax returns for the estate and his failure to investigate possible preferential transfers. *In re Evans*, 48 B.R. at 48–49. In *In re Patman Drilling Int'l, Inc.*, the "best interests" test was met where the "vast majority of creditors" had "lost confidence in the Debtor's management" and supported the appointment of a trustee. *In re Patman Drilling Int'l, Inc.*, 2008 WL 724086, at *6.

55.     This case bears all of these factors on which these Texas courts routinely appointed a Chapter 11 Trustee.

   i.     *First Factor: Debtor's Trustworthiness*

56.     Debtors misled the Lenders and the Court into entering Cash Collateral orders based on budgets which are not reflective of reality. The Debtors further obfuscated their management and cash systems, failed to comply with U.S. Trustee requirements (such as naming the U.S. Trustee as insurance loss payee) and presented inflated rent rolls. This factor weighs in favor of appointing a Chapter 11 Trustee.

   ii.     *Second Factor: Past and Present Performance and Prospects for the Debtor's Rehabilitation*

57.     Debtors are operating at a loss and there is significant likelihood the Lenders are undersecured. Debtors do not and will not have sufficient operational cash flow to cure and reinstate debt service, even under ideal and competent management. The Debtors' only hope is to sell the properties under Bankruptcy Code § 363(f), but the Debtors will have no ability to sell free and clear of Lender's lien without payment in full. Debtors have neither the means nor the competence to run that sale process. This factor weighs in favor of appointing a Chapter 11 Trustee.

   iii.     *Third Factor: The Confidence—or Lack Thereof—of the Business Community and of Creditors in Present Management*

109221261.1

58.     Lenders have been the most active and involved creditors in these cases. For the reasons set forth herein, the Lenders have no confidence in Mr. Khalsa and Mr. Polavarapu.

59.     There is no evidence to indicate any other party in interest has a different view of Debtors' present management. It is likely Lynd Management would share Lenders' views of present management as a member of the business community in which the Debtors operate. This factor weighs in favor of appointing a Chapter 11 Trustee.

      iv.     *Fourth Factor: The Benefits Derived by the Appointment of a Trustee; Balanced Against the Cost of the Appointment.*

60.     Lenders decision to seek appointment of a Chapter 11 Trustee was the result of a careful and deliberative process. Lenders understand and appreciate that the economic burden of funding a Chapter 11 Trustee in such cases often falls upon the lender. Lenders have determined that those costs are outweighed by the benefits of a Chapter 11 Trustee.

61.     The first benefit of a Chapter 11 Trustee is obvious: a Trustee will competently manage the Debtors' day-to-day business.  In this regard, it is critical for the Court to be mindful not only of the interests of Lenders and other creditors, but of the approximately 1,000 Houstonians who reside on the Debtors' properties. Indeed, it is likely a Trustee will be able to operate the Debtors' properties with an efficiency and attentiveness unmatched throughout the Debtors' operational history, potentially unlocking valuations otherwise unobtainable.

62.      Second, the estates will significantly benefit from a Section 363 sale process overseen by a Chapter 11 Trustee with specific experience conducting such sales.  The Debtors have not been effectively managing the sale process, which has not yet been commenced due to the Debtors' inability to provide marketing materials to their brokers.

63.     Third, the known facts regarding the Debtors' accounting and cash management practices requires forensic investigation. The Debtors will decline to investigate themselves. A

109221261.1

Chapter 11 Trustee, with access to the Debtors' books, records, and privileges, will be uniquely qualified to conduct such an investigation. A Chapter 11 Trustee will also serve the interests of these four Debtors and their creditors alone, without any competing interests in Debtors' other properties or management lines.

64.    Finally, there are millions of dollars of insider transfers which must be investigated for potential avoidance actions. The Debtors will decline to bring those actions against their own current management. The estates will significantly benefit from a Chapter 11 Trustee with the knowledge and experience to bring those avoidance actions and maximize recovery for the estates. This factor weighs in favor of appointing a Chapter 11 Trustee.

## CONCLUSION

The basic facts set forth herein establishing cause are largely undisputed. Lenders, as the Debtor's largest creditor and first priority lienholder, have no faith in the ability of Debtors to fulfill their fiduciary duties. At every turn, Lenders uncover more evidence of Debtors' pre-petition and post-petition dishonesty, incompetence, and gross mismanagement. For all the reasons set forth herein, the only path forward is the appointment of a Chapter 11 Trustee.

WHEREFORE Lenders respectfully requests entry of an Order for the appointment of a Chapter 11 trustee pursuant to § 1104 and for such other and further relief as is proper.

Respectfully submitted,

**POLSINELLI PC**

By: */s/ Michael L. Schuster*
Michael L. Schuster (*pro hac vice*)
1401 Lawrence Street, Suite 2300
Denver, CO  80202
Phone: (720) 931-1188
Email: mschuster@polsinelli.com
*Counsel for Lenders (as defined herein)*

109221261.1

## **CERTIFICATE OF SERVICE**

I, Michael L. Schuster, hereby certify that on February 23, 2026, a true and correct copy of the foregoing *Motion* was (i) served electronically via the Court's CM/ECF system to Debtors' counsel, the U.S. Trustee, and the interested parties who have requested to receive ECF notification from the court in this case, which are listed below and (ii) served via U.S. mail, postage prepaid, to the creditors listed below.

*/s/  Michael L. Schuster*

## **VIA CM/ECF ONLY**

Phillip Kyle Cheves on behalf of Creditor Computershare Trust Company, NA, as Trustee for the benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2024-5C1, Commercial Mortgage Pass-Through Certificates, Series 2024-5C1
kcheves@polsinelli.com

Susan R. Fuertes on behalf of Creditor Harris County
susan.fuertes@harriscountytx.gov, taxbankruptcy.cao@harriscountytx.gov

Tara L Grundemeier on behalf of Creditor City of Houston
houston_bankruptcy@lgbs.com

Tara L Grundemeier on behalf of Creditor Houston City College
houston_bankruptcy@lgbs.com

Tara L Grundemeier on behalf of Creditor Houston ISD
houston_bankruptcy@lgbs.com

Leigh Ann Hoffman on behalf of Creditor Lynd Management Group, LLC
lhoffman@lippes.com

Matthew Scott Okin on behalf of Debtor Falls of Braeburn, LLC
mokin@okinadams.com, sgonzales@okinadams.com;nhollon@okinadams.com

Jayson B. Ruff on behalf of U.S. Trustee US Trustee
jayson.b.ruff@usdoj.gov

Michael Schuster on behalf of Creditor Computershare Trust Company, NA, as Trustee for the benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2024-5C1, Commercial Mortgage Pass-Through Certificates, Series 2024-5C1
mschuster@polsinelli.com, mhammond@polsinelli.com

109221261.1

Christopher Ross Travis on behalf of U.S. Trustee US Trustee
C.Ross.Travis@usdoj.gov

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

Melissa E Valdez on behalf of Creditor Spring Branch Independent School District and City of
Houston
mvaldez@pbfcm.com, mvaldez@ecf.courtdrive.com;arandermann@pbfcm.com

Timothy L. Wentworth on behalf of Debtor Falls of Braeburn, LLC
twentworth@okinadams.com, sgonzales@okinadams.com;nhollon@okinadams.com

## VIA U.S. MAIL

| | | |
|---|---|---|
| Harris County Attorneys' Office<br>PO Box 2848<br>Houston, TX 77252-2848 | AETexas<br>PO Box 738376<br>Dallas, TX 75373-8376 | Comcast<br>PO Box 60533<br>City of Industry, CA 91716-0533 |
| GFL Environmental<br>PO Box 1560<br>Detroit, MI 48255-5193 | Internal Revenue Service<br>Centralized Insolvency Ops.<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | ProEnergy<br>PO Box 644007<br>Dallas, TX 77253-3064 |
| Rao J. Polavarapu<br>9303 Town Park Dr., 2nd Fl.<br>Houston, TX 77036-2441 | Texas Comptroller of Public Accts<br>Revenue Accounting Div<br>Bankruptcy Section<br>PO Box 13528<br>Austin, TX 78711-3528 | Symmetry Energy Solutions<br>PO Box 301149<br>Dallas, TX 75303-1149 |
| TXU Energy Retail Company LP<br>C/o Bankruptcy Dept<br>PO Box 650393<br>Dallas, TX 75265-0393 | Texas Attorney General<br>300 W 15th Street<br>Austin, TX 78701-1649 | Texas Yellowstone Construction LLC<br>2962 Washington Dr<br>Houston, TX 77038-3321 |
| Waste Connections<br>PO Box 679859<br>Dallas, TX 75267-9859 | Waste Management<br>PO Box 660345<br>Dallas, TX 75266-0345 | Wells Fargo Bank NA<br>Attn: Legal Department<br>401 S Tryon St Fl 8<br>Charlotte, NC 28202-1931 |
| Alief Independent School District<br>PO Box 368<br>Alief, TX 77411-0368 | AT&T<br>PO Box 5014<br>Carol Stream, IL 60197-5014 | Spring Branch ISD<br>PO Box 19037<br>Houston, TX 77224-9037 |

109221261.1